United States District Court
Southern District of Texas
**ENTERED**
March 15, 2022
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

| | | |
|---|---|---|
| YESTER AVILA, *individually and on behalf of all others similarly situated,* | § § § | |
| Plaintiffs. | § § | |
| VS. | § § | CIVIL ACTION NO. 3:18-cv-00426 |
| SLSCO, LTD., *et al.,* | § § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Before me are two motions filed by Defendant SLSCO, Ltd. ("SLS"): (1) Motion for Conditional Class Decertification ("Motion for Decertification"); and (2) Motion for Summary Judgment ("Motion for Summary Judgment"). *See* Dkt. 88 and Dkt. 89. After reviewing the briefing, hearing oral argument, and considering the applicable law, I recommend that the Motion for Decertification be **GRANTED**, and the Motion for Summary Judgment be **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

SLS is a construction management company that provides residential and commercial construction services. Specifically, SLS assists federal, state, and local governments and agencies with emergency response efforts, including the rapid repair and restoration of homes and neighborhoods.

### The Hurricane Relief Projects

Following Hurricanes Irma and María, SLS was awarded contracts for cleanup and repair in Puerto Rico (the "Puerto Rico Project") and the U.S. Virgin Islands (the "USVI Project"). In Puerto Rico, SLS served as the prime contractor under a contract with the Puerto Rico Department of Housing (the "Puerto Rico Contract"). SLS, in turn, contracted with roughly 110–120 subcontractors to restore over 27,500 homes. SLS played a smaller role in the USVI Project, where it

performed limited general contracting services under AECOM Caribe, LLP's ("AECOM") prime contract with the Virgin Islands Housing Finance Authority (the "USVI Contract"). There, SLS engaged roughly 10–15 subcontractors to restore approximately 1,640 homes. Both projects were part of the Federal Emergency Management Agency's Sheltering and Temporary Essential Power Program (the "STEP Program").

### How the Projects Worked

For each project, the STEP Program developed a "scope-of-work document" that outlined general construction specifications. *See* Dkt. 93-1 at 85–86. SLS or its staffing subcontractor would perform an initial inspection and damage assessment for each home and develop a scope of work that complied with the general construction specifications. SLS contracted out the repair and restoration work to various subcontractors. *See* Dkt. 88-1 at 3, 5. Subcontractors would receive a line-item work order for each assignment—essentially a list defining what needed to be fixed or replaced. SLS distributed work orders to its subcontractors via a password-protected online portal, which subcontractors accessed using either their own internet-connected devices or Samsung tablets provided by SLS.

Subcontractors signed identical—or near-identical—subcontractor agreements, under which they were required to, among other things: (1) "furnish all supervision, labor, equipment, materials, and supplies necessary . . . to perform the work described in" each work order; (2) perform work "in accordance with applicable codes, laws, and governmental requirements"; and (3) comply with and be bound by the terms in either SLS's Puerto Rico Contract or AECOM's prime contract. *See* Dkt. 88-1 at 3, 5, 10, 20–21. The latter is often referred to as a "flow-down" or "pass-down" provision. *See* Dkt. 93-1 at 18. Subcontractors also signed a "wage compliance certification," affirming they were familiar and would comply with applicable local and federal wage standards. *See* Dkt. 93-2 at 6–7.

2

SLS paid the contractors directly, but its payments were on a unit-price (or line-item) basis,[1] meaning the amount received by the subcontractors was not affected by the number of individuals working on a particular assignment or the number of hours worked by those individuals. *See id.* at 5; Dkt. 93-1 at 20; Dkt. 88-1 at 4, 6. Subcontractors determined their workers' wages and were responsible for paying them for the work they performed—SLS had no input or oversight. Aside from a handful of audits performed as part of the Puerto Rico Department of Housing's wage-compliance program, SLS did not request nor maintain its subcontractors' pay records. *See* Dkt. 93-1 at 37–39.

Subcontractors were expected to supply their own means and methods of work—e.g., materials, labor, and supplies. However, "all materials . . . had to be approved by the [STEP] Program." Dkt. 93-2 at 13. This requirement did not apply to tools or consumables. *See id.* Given that these were massive construction projects on islands with limited construction materials, in certain situations, SLS would order high-volume, program-approved materials—usually those with long lead times—and store them at an onsite warehouse, where subcontractors could collect them. *See* Dkt. 93-1 at 27; Dkt. 93-2 at 12–13 (explaining that SLS ordered "approved" hard hats, safety vests, toilets, door handles, and roof sealer). Subcontractors were not required to use materials ordered by SLS. But if they did, SLS would deduct the price for those materials from the subcontractor's invoice. *See* Dkt. 93-1 at 28.

SLS took a hands-off approach when it came to the actual performance of restoration work. After issuing a work order, SLS did not supervise or control day-to-day activities. *See* Dkt. 88-1 at 4–5, 7–8. Specifically, SLS had no say on how the

---

[1] Under a unit-price contract, a contractor is paid an agreed-upon amount for the quantity of each line item performed as measured in the field during construction. Each unit price includes labor, material, equipment, overhead, and profit attributable to that scope of work. For example, on the USVI Project, replacing a kitchen sink with a new stainless-steel sink and faucet was priced at $492.88 per unit. *See* Dkt. 88-1 at 28. Labor costs to disconnect and discard the current sink and install the new sink were built into the unit price. *See id.*

work was performed, what workers the subcontractor hired to perform the work, the number of workers assigned to a given project, or the hours worked by individual workers. *See id.* at 4, 6. Subcontractors were also given the freedom to hire third-tier subcontractors and cede control over their scope of work—e.g., requiring sub-subcontractors supply their own materials, tools, equipment, or laborers. It appears that the only limitation placed on a subcontractor's ability to engage sub-subcontractors was that the subcontractor had to obtain SLS's written consent, and any sub-subcontract had to incorporate the "General Terms and Conditions" of the subcontractor's contract with SLS through a flow-down provision. *See id.* at 4, 6; Dkt. 89-5.

SLS's direct contact on the jobsite was generally limited to the initial and final inspections,[2] as well as periodic "spot checks" or "completion checks"—e.g., intermediary quality or safety inspections or "change order" inspections to determine whether to adjust a project's scope of work. *See* Dkt. 88-1 at 3. *See also* Dkt. 93-1 at 45, 99−100; Dkt. 93-2 at 9. That said, SLS was tasked with enforcing jobsite safety standards implemented by the STEP Program. *See* Dkt. 93-2 at 9. In addition, SLS conducted "periodic [safety] training with the managers of subcontract companies [to] pass down any new information" to their employees. *Id.* As with the initial inspection, final inspections were performed by SLS or its staffing subcontractor. For the Puerto Rico Project, SLS performed final inspections alongside a Puerto Rico Department of Housing representative. *See* Dkt. 88-1 at 3, 5.

The Samsung tablets distributed by SLS are a point of emphasis in this case. Though SLS's web portal was accessible via any device with an internet connection, subcontractors generally used the tablets provided by SLS to do so. In addition to distributing work orders via its web portal, SLS also required subcontractors to

---

[2] William Sullivan, SLS's corporate representative, also testified that an inspector would typically meet with subcontractors at the beginning of a project to "go over the initial inspection and plan going forward" and "open [the jobsite] up" so that the subcontractors could "get to work." Dkt. 93-1 at 96.

upload pictures of completed tasks, which SLS would review to determine whether to approve the order or schedule a final inspection. *See id.* at 5–6. SLS also developed a proprietary software application, which it preloaded onto the tablets, through which subcontractors could update their progress or request change orders. *See* Dkt. 93-2 at 7. However, it is relevant to note that only the subcontractors' "project managers" or "crew leaders" were given tablets, which they then used to disseminate work assignments to individual crew members. *See id.* at 8–9.

Although SLS contends that certain responsibilities under the Puerto Rico Contract and USVI Contract "flowed down" to its subcontractors under the terms of its subcontractor agreements, it is undisputed that SLS was ultimately responsible to its clients for ensuring the houses were up to code—i.e., the final work product.

### The Lawsuit and Prior Conditional Class Certification

Yester Avila ("Avila") worked as a quality manager for Defendant the Ironsides Group, LLC ("Ironsides"), a subcontractor on the Puerto Rico Project. Avila alleges that he and other co-workers were misclassified as independent contractors and paid a flat sum or "day rate" for each day that they worked. Avila claims that regardless of how many hours he and other co-workers worked in a workweek, they never received overtime pay.

Caleb Browne ("Browne") worked as a labor crew leader for ProSolar America ("ProSolar"), a subcontractor on the USVI Project. He alleges that he and other co-workers were misclassified as independent contractors and paid the same hourly rate without overtime, regardless of the number of hours worked in a workweek.

In December 2018, Avila and Browne (collectively "Named Plaintiffs") sued SLS and Ironsides (collectively "Defendants") to recover unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, Puerto Rico's

Working Hours and Days Act, 29 L.P.R.A. § 271 *et seq.*, and the Virgin Islands Fair Wage and Hours Act 24 V.I.C. § 1 *et seq.*

In August 2019, Named Plaintiffs moved for conditional certification on their FLSA claims. The following February, United States District Judge Jeffrey V. Brown conditionally certified two collective classes:

> (1) All workers employed by or on behalf of SLS and any subsidiaries, alter egos, or co-employers as hurricane relief laborers who were classified as independent contractors and paid a day rate with no overtime compensation (the "Day-Rate Class"); and

> (2) All workers employed by or on behalf of SLS and any subsidiaries, alter egos, or co-employers as hurricane relief laborers who were classified as independent contractors and received straight time for overtime with no overtime compensation (the "Hourly Class").[3]

*Avila v. SLSCO, Ltd.*, No. 3:18-CV-00426, 2020 WL 1891691, at *5 (S.D. Tex. Feb. 10, 2020).

Covid-19 significantly hampered the notice process, but sending notice to potential class members would have proven difficult absent a global pandemic. Because SLS did not directly employ or compensate its subcontractors' workers, it did not have in its possession the potential class members' contact information or other relevant personnel records.[4] In an effort to obtain this information, at the Court's direction, the parties sent SLS's subcontractors a joint letter requesting the voluntary production of relevant employee records; however, few subcontractors complied. Plaintiffs then subpoenaed a handful of subcontractors but, again, received a sporadic production of documents. All said, Court-approved notice did not go out (to roughly 750 potential opt-ins who worked for 66 subcontractors)

---

[3] Both classes run from January 16, 2018, to February 10, 2020.

[4] While SLS did maintain some payroll records, those records were maintained as part of the Puerto Rico Department of Housing's wage-compliance monitoring program and, therefore, concerned only a handful of its subcontractors on the Puerto Rico Project and covered snippets of the relevant class period.

until November 2020. Potential class members were required to submit their consent-to-join forms with the Court no later than January 19, 2021.

In light of the above-mentioned obstacles—as well as a then-looming docket call—I set an expedited discovery schedule in December 2020. Specifically, I ordered all putative class members that opt-in to this action ("Opt-in Plaintiffs") to complete a Court-approved discovery questionnaire aimed at assisting Defendants in determining whether the Opt-in Plaintiffs are similarly situated. Responses to the Court-ordered discovery were due, at the absolute latest, by January 29, 2021.

SLS has moved to decertify the conditional collective classes and for summary judgment. *See* Dkt. 88 and Dkt. 89. I address each motion in turn.

## II.   MOTION FOR DECERTIFICATION

SLS's Motion for Decertification may very well be one of the last of its kind in this circuit. In January 2021, the Fifth Circuit did away with conditional certification altogether. *See Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430 (5th Cir. 2021). But because the Court conditionally certified the collective classes in this case before the Fifth Circuit decided *Swales*, I address SLS's Motion to Decertify applying the well-known two-step process outlined in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). However, for all intents and purposes, this is a distinction without a difference since, "[p]ost-*Swales*, the question courts must answer when deciding whether to certify a collective action is the same question it would ask at the second stage of the *Lusardi* analysis: are [Named] Plaintiffs and [Opt-in Plaintiffs] sufficiently 'similarly situated' such that this case should proceed on a collective basis?" *Kibodeaux v. A&D Ints., Inc.*, No. 3:20-CV-00008, --- F.3d ---, 2022 WL 92856, at *6 (S.D. Tex. Jan. 10, 2022)

In making this determination, I must consider: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [the] defendant which appear to be individual to each plaintiff; and (3) fairness

and procedural considerations." *Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 226 (5th Cir. 2011) (quotation omitted).

## A. NARROWING THE CLASSES

Before I jump into the decertification analysis, however, I first must address a few threshold issues regarding the Opt-in Plaintiffs. The FLSA gives employees the right to bring an action on behalf of themselves and "other employees similarly situated." 29 U.S.C. 216(b). Section 216(b) establishes an opt-in scheme under which plaintiffs must affirmatively notify the court, in writing, of their intention to become part of the collective action. *See id.*

SLS's Motion to Decertify estimated there are "about 100 Opt-ins in this case." Dkt. 88 at 6. Of those, SLS argued nine failed to timely opt-in to this action. *See id.* at 15. SLS also argued that somewhere between 50 and 59 of the approximate "100 Opt-ins" failed to respond to the Court-ordered discovery. *See id.* at 13–14 ("SLS has information relating to only about 50 of the Opt-ins and the named Plaintiffs; 50 of the Opt-ins entirely failed to respond to the discovery mandated by the Court."); Dkt. 94 at 4 ("Fifty-nine Opt-in Plaintiffs failed to respond to Court[-]ordered discovery and should be dismissed."). SLS also identified a slew of Opt-in Plaintiffs whom it claims "had withholding taken out of payments and/or W-2s issued and were therefore not independent contractors" or "were paid overtime and should be dismissed." Dkt. 94 at 2. *See also* Dkt. 88-2; Dkt. 88-9; Dkt. 94-2; Dkt. 94-3. Unfortunately, SLS's briefing frequently cited payroll records that were not part of the record.

In an attempt to clear things up, I ordered the parties to submit an agreed list of: (1) all plaintiffs in this case; (2) all plaintiffs who failed to respond to Court-ordered discovery; and (3) all plaintiffs whose payroll records show that they are not properly members of either collective class. *See* Dkt. 106. The parties timely complied. *See* Dkt. 107. In addition, SLS submitted contested lists of Opt-in Plaintiffs it argues either failed to substantively respond to the Court-ordered discovery or whose payroll records show they are not properly members of either

class. *See* Dkt. 107-4; Dkt. 107-5. Regarding the latter, SLS included 87 pages of pay records to support its claim. *See* Dkt. 108-1.

### 1. *Untimely Opt-ins*

Save for the applicable statute of limitations, the FLSA does not specify when a person must opt-in to a collective action; rather, the deadline is set by the court. *See* 29 U.S.C. §§ 216(b), 255, and 256. Nor does the FLSA provide a standard under which a district court should consider whether to include opt-in plaintiffs who file consent forms after the court-imposed deadline. Caselaw on this issue is wide-ranging, but courts have generally decided the question by balancing various combinations of the following factors: (1) whether "good cause" exists for the untimeliness; (2) prejudice to the defendant; (3) how late the consent forms were filed; (4) judicial economy; and (5) the remedial purposes of the FLSA. *See Ruggles v. Wellpoint, Inc.*, 687 F. Supp. 2d 30, 37 (N.D.N.Y. 2009) (collecting cases).

The parties' agreed list indicates that the classes consist of 107 individuals, including Named Plaintiffs. *See* Dkt. 107-1. This time around, SLS argues that only five Opt-in Plaintiffs failed to timely file their consent-to-join forms with the Court. *See* Dkt. 107 at 1. Candidly, I am still unable to fully comprehend the parties' math, but I will accept their calculations.[5]

Plaintiffs wholly fail to address the timeliness issue. *See* Dkt. 93. However, SLS phones it in as well, stating only that any untimely opt-in "should be dismissed on that ground." Dkt. 88 at 15. Ultimately, I do not need to address the timeliness issue because the Opt-in Plaintiffs who failed to timely file their consent-to-join

---

[5] The parties' joint letter states that the deadline to join this action was January 15, 2021. *See* Dkt. 107 at 1. *But see* Dkt. 88 at 15 (arguing the deadline was January 18, 2021). This appears to be incorrect, as that would mean 13 Opt-in Plaintiffs failed to timely file their consent-to-join forms. Regardless, by my count, nine Opt-in Plaintiffs filed their consent-to-join forms after January 19, 2021 (January 18 was Martin Luther King, Jr. Day). *See* Dkts. 86, 87, 97. Four filed them on January 22, 2021, *see* Dkt. 86; four more filed them on February 23, 2021, *see* Dkt. 87; and the final untimely Opt-in Plaintiff filed his consent form on April 21, 2021. *See* Dkt. 97. Ultimately, for the reasons explained in this and the following subsection, the discrepancy is immaterial, but it is indicative of the many hurdles faced navigating the piecemeal record.

forms also failed to respond to the Court-ordered discovery. As explained below, that is an independent reason to dismiss them from the case.

### 2. *Class Members Who Failed to Respond to Court-Ordered Discovery*

Responses to the Court-ordered discovery questionnaire were due, at the absolute latest, by January 29, 2021. The parties agree that 61 Opt-in Plaintiffs never responded. *See* Dkt. 107-2. SLS asks me to dismiss these Opt-in Plaintiffs. *See* Dkt. 94 at 4.

"If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." FED. R. CIV. P. 41(b). *See also* FED R. CIV. P. 37(b)(2)(A)(v) (authorizing the court to dismiss an action or proceeding "in whole or in part" if a party "fails to obey an order to provide or permit discovery"). Courts may also *sua sponte* dismiss a case for failure to prosecute. A court's authority to do so under either scenario draws from its inherent authority to manage its docket. *See Boudwin v. Graystone Ins. Co.*, 756 F.2d 399, 401 (5th Cir. 1985). A dismissal may be with or without prejudice. *See* FED. R. CIV. P. 41(b). A dismissal with prejudice for failure to comply with a court order is generally improper unless the litigant's failure was "the result of purposeful delay or contumaciousness and the record reflects that the district court employed lesser sanctions before dismissing the action." *Long v. Simmons*, 77 F.3d 878, 880 (5th Cir. 1996).

There is no question that the failure to comply with the Court-ordered discovery supports dismissal without prejudice under either Rule 41(b) or Rule 37. *See, e.g.*, *Kraft v. Freight Handlers, Inc.*, No. 618CV1469ORL78GJK, 2020 WL 6293158, at *2 (M.D. Fla. July 17, 2020) (dismissal without prejudice appropriate sanction in FLSA case where opt-in plaintiffs failed to respond to discovery); *Marshall v. La. State*, No. 15-1128, 2017 WL 90655, at *5–6 (E.D. La. Jan. 10, 2017) (dismissing plaintiffs without prejudice because "the failure of these opt-in plaintiffs to respond to the discovery questionnaire prevents the Court from

accurately determining whether they are similarly situated such that they could proceed collectively in this action"); *Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050 SC, 2011 WL 843956, at *4–7 (N.D. Cal. Mar. 8, 2011) (dismissing without prejudice claims of class members who failed to respond to defendant's discovery requests).

Accordingly, I recommend that those claims brought by the 61 Opt-in Plaintiffs who have failed to respond to the Court-ordered discovery be dismissed without prejudice.[6]

### 3. *Class Members Who Received Overtime Compensation or Were Otherwise Fairly Compensated Under the FLSA*

The parties agree that six Opt-in Plaintiffs' payroll records show they are not properly members of either class. *See* Dkt. 107-4. Of those, I have already recommended the Court dismiss four for their failure to respond to the Court-ordered discovery. I now recommend the Court dismiss the remaining two Opt-in Plaintiffs.[7]

SLS submitted its own list of an additional 24 Opt-in Plaintiffs (excluding Opt-ins who failed to respond to the Court-ordered discovery), which it contends,

---

[6] In alphabetical order by last name: Arroyo, Jose Rivera; Berberena, Fernando Monteverde; Bermundez, Eliezer; Cajigas Lorenzo, Derek; Centeno, Jesus Rodriguez; Colon, Angel Luis Perez; Conception, Orlando Vega; Correa, Wilberto Saldana; Cruz, Miguel A. Hernandez; DeJesus, Luis Manual; DeJesus, Vicmael Blanco; Diaz, Damarys; Diaz, Jamie A. Mercado; Diaz, Julio; D'Oleo, Jario; Donastrong, Adala; Figueroa, Samuel Ramos; Franks, Marjorie; Franks, Michael; Gonzalez, Steven Torres; Harris, Daniel Molina; Hernandez, Camelo Roman; Hernandez, Kevin Cruz; Jenkins; Robert K.; Juarbe, Samuel Jirao; Langdon, Wendy; Lebron, Jose A. Ocasio; Lopez, Francisco Pantoja; Martinez, Joaquin O. Laborde; Martinez, Luis Astol; Martinez, Rudy; Matos, Samuel; Mercado Salgado, Axel; Mills, Jermaine Liburd; Muniz, Edric Jimenez; Negron, Gabriel Ortiz; Nieves, Victor; Ortiz Ortiz, Jorge Luis; Ortiz, Dan; Ortiz, Josue F.; Otero, Juan Montoya; Padin, Alexis Rivera; Paoli, Wilfredo; Pedrose, Jose David Del Toro; Perez, Lawrence Torres; Pomales, Bryan Cruz; Rivas-Diaz, Samuel; Rivera, Jeremy Reyes; Rivera, Liz Y. Morales; Rodriguez, Benjamin Otero; Rodriguez, Denysi Diaz; Rodriguez, Nelson A.; Rodriguez, William Agosto; Rosario, Luis; Ruiz, Luis Cuevas; Salinas Maldonado, Francisco; Santiago, Deweld Luciano; Santiago Reynaldo; Torres, Roberto Guzman; Torres, Yesica Yinet Torres; and Valdez, Edgar Martinez. *See* Dkt. 107-2.

[7] Colon, Luis Diaz; and Headrick, Paul. *See* Dkt. 107-4.

based on their pay records, are not properly part of either class. *See* Dkt. 107-5. I will address this argument as part of my similarly situated analysis.

## B.   SIMILARLY SITUATED

At the decertification stage, it is the plaintiffs' burden to prove that the individual class members are similarly situated. *See Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008). The FLSA does not define "similarly situated," leaving the matter for courts to determine. However, courts have consistently held that "similarly situated" does not mean identically situated, as that would run counter to the FLSA's broad remedial purpose and undermine its intent to promote cost-efficient joint adjudication of claims. "Rather, an FLSA class determination is appropriate where there is a demonstrated similarity among the individual situations some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice." *Xavier v. Belfor USA Grp., Inc.*, 585 F. Supp. 2d 873, 877–78 (E.D. La. 2008) (cleaned up). *See also Tolentino v. C & J Spec-Rent Servs. Inc.*, 716 F. Supp. 2d 642, 647 (S.D. Tex. 2010) ("there must be a showing of some identifiable facts or legal nexus that binds the claims so that hearing the cases together promotes judicial efficiency" (quotation omitted)).

Conclusory or unsubstantiated "allegations of an overarching policy are insufficient, and plaintiffs are required to produce substantial evidence of a single decision, policy or plan." *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409–10 (W.D. Pa. 2000) (cleaned up). *See also Proctor*, 250 F.R.D. at 281 ("If there is no single decision, policy, or plan that affects the Plaintiffs, the case will have enormous manageability problems." (quotation omitted)).

In considering whether plaintiffs have demonstrated sufficient similarity, courts consider the following factors: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [the] defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Roussell*, 441 F. App'x at 226 (quotation omitted).

"[T]he more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007).

Ultimately, the decision of whether to decertify a collective action is soundly within the district court's discretion. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213 (5th Cir. 1995) (reviewing the district court's application of the legal standard at the decertification stage for abuse of discretion). If I determine Plaintiffs[8] have failed to establish sufficient similarity, I must decertify the classes and dismiss the remaining Opt-in Plaintiffs' claims without prejudice. Barring a dispositive motion—such as SLS's Motion for Summary Judgment—trial will proceed on the class representatives' individual claims. *See Xavier*, 585 F. Supp. 2d at 878.

### 1. *Plaintiffs' Disparate Factual and Employment Settings (the first decertification factor)*[9]

Plaintiffs' theory of the case depends on my finding that a joint-employer relationship exists between SLS and its subcontractors (which I address under the second decertification factor). In a sense, addressing the class members' disparate factual and employment settings (the first decertification factor) puts the cart before the horse. But it is relevant here, as my decision turns, in part, on the lack of representative evidence regarding the class members' respective employment settings.

The first factor assesses the Opt-in Plaintiffs' job duties, geographic location, supervision, and salary to determine if Plaintiffs are similarly situated. *See Moss*, 201 F.R.D. at 409. Looking at employees' job duties, courts analyze the employer's classification of employees and the level of similarity in actual job performance of

---

[8] I use the term "Plaintiffs" to refer to both Named Plaintiffs and Opt-in Plaintiffs.

[9] Plaintiffs' Response to SLS's Motion to Decertify does not expressly address this factor. Instead, Plaintiffs spend their briefing discussing whether Plaintiffs' alleged classification as independent contractors supports collective treatment. I have tried my best to parse out the portions of Plaintiffs' argument that are responsive to this decertification factor.

all plaintiffs. *See Lipnicki v. Meritage Home Corp.*, No. 3:10-cv-605, 2014 WL 5620603, at *3 (S.D. Tex. Nov. 4, 2014). Uniformly classifying employees as exempt employees, "[a]bsent similarity in actual job performance . . . may be insufficient to meet the certification standard" because blanket classification decisions do not automatically qualify affected employees as similarly situated. *Id.*

Plaintiffs argue that "[b]ecause SLSCO imposed the same policies and treatment on all its subcontractors, and therefore all workers provided through its subcontractors," the question of "whether the Plaintiffs were subject to a common policy and/or common treatment by SLSCO in how they were classified and how they were paid" can be answered collectively. Dkt. 93 at 8. SLS, on the other hand, maintains that, at most, Plaintiffs have presented evidence of sporadic FLSA violations arising out of individual circumstances, not a common plan, policy, or decision among SLS and its subcontractors to violate the FLSA. *See* Dkt. 88 at 20–21.

I find that Plaintiffs have demonstrated that they worked in the same geographic regions and that the alleged violations occurred during the same general time period. However, the other considerations demonstrate disparate factual and employment settings.

After thinning the herd, the remaining collective classes consist of 44 individuals who worked for at least 21 different subcontractors.[10] Of those subcontractors, Plaintiffs have provided deposition testimony from three individuals who worked for DEL Enterprise ("DEL") on the USVI Project—Pedro Hernandez, Steven Hill, and Kristopher Ray—and one individual who worked as a

---

[10] (1) iSpire, LLC (one); (2) Ironsides Group, LLC (three); (3) ProSolar America (one); (4) A&Y (one); (5) Landel Land Clearing LLC d/b/a DEL Enterprise (five); (6) Sieverding Construction, Inc. (ten); (7) CashDollar, Inc. (two); (8) White & Blue Group, LLC (three); (9) Kreuger & Toll Construction (one); (10) International Disaster (two); (11) RFP Emergency Services (two); (12) Pimel Corp. (one); (13) Global Specialty Services (one); (14) In-Line Disaster Recovery, LLC (one); (15) 13 Tons, Inc. (one); (16) Landgrow LLC (two); (17) Timbercrete (one); (18) CNJ Construction (one); (19) Cooperative Communications (one); (20) Rebuild General Contractor (one); (21) BGI (one); and (22) unidentified (two). *See* Dkt. 88-2.

quality manager for Ironsides on the Puerto Rico Project—Avila. Plaintiffs also included the sworn declaration of Browne, who was a labor crew leader for ProSolar on the USVI Project. *See* Dkt. 34-2. To help contextualize my discussion, a summary of the relevant deposition testimony is below.

- **Pedro Hernandez (USVI – carpenter – DEL)** testified that his interactions with SLS representatives were limited to "maybe four" quality or safety inspections. *See* Dkt. 88-6 at 11. SLS never told Hernandez how to perform his job; rather, Hernandez's DEL supervisor told him when and where to work. *See id.* at 11–12. DEL also supplied Hernandez with tools and an onsite vehicle. *See id.* at 11–13. When an SLS representative did visit the jobsite, the representative primarily communicated "with the lead on the site" to ensure DEL employees had proper safety equipment. *See id.* at 11. Aside from the handful of quality and safety inspections, Hernandez did not identify any other jobsite interactions with SLS personnel.

  Essentially, Hernandez believes SLS was also his employer because SLS personnel—or, at least people he believed worked for SLS—were present when he "received [his ID badge]" when he first arrived in the USVI. *Id.* at 6–7. But Hernandez testified that his DEL supervisor took him to get his ID badge, AECOM personnel were also present, and he filled out a "USVI AECOM ID" security badge request form. *See id.* at 7, 11, 14. *See also id.* at 15 ("I don't know if it was SLS or AECOM that one that specifically gave me the badge.").

- **Steven Hill (USVI – carpenter – DEL)** testified that he interacted with SLS at morning safety meetings and that SLS "inspectors" would frequently stop by the jobsites to either give safety advice or perform quality inspections. Dkt. 93-7 at 8–10. But Hill admitted his foreman or site manager, both of whom were DEL employees, delegated his work assignments and that he did not receive instructions from SLS regarding how to perform his job. *See id.* at 16 ("the reason they hire carpenters to come down there is because you don't have to tell them what to do").

- **Kristopher Ray (USVI – crew leader – DEL)** testified that SLS assigned work orders and performed quality control inspections to ensure "that all the jobs were done correctly" before "we turned [the site] over to the FEMA inspectors." Dkt. 93-10 at 6, 8. Hill also testified that the only instruction he received from SLS concerned how to operate the Samsung tablet. *See id.* at 7 ("The only thing that was

15

instructed to me was how to use the -- the computer system, the tablet, to document all the work for FEMA. . . . SLS was the one that walked us through the electronic parts to make sure that everything was documented."); *id.* at 8 (Q: "[O]nce you actually got the job, was SLS directing you on how to do the construction work you were performing? A: No."); *id.* at 9 ("[SLS] directed me how to -- like, when there was maybe an issue on what would pass an inspection or something, he directed me on what kind of fixes, you know, we would have to perform in order to -- to meet that standard.").

- **Yester Avila (PR – quality manager – Ironsides)** did not perform any construction work. Instead, unlike other laborers, he directly interacted with SLS representatives on a regular basis. Avila was present for SLS's initial inspection to determine the scope of work. *See* Dkt. 93-5 at 10. SLS would also schedule a "mid-progress" inspection and a final inspection, both of which he attended along with the Ironsides' crew leader for that project. *See id.* at 12. Avila testified that SLS occasionally performed "spot check" inspections, for which he was not always present. If SLS discovered any issues with Ironsides' work, it would notify Avila—usually by highlighting the problem areas on the project's work order—who was tasked with communicating those issues to an Ironsides crew leader. *See id.* SLS also periodically notified Avila if it needed Ironsides to submit photos of its work to document a particular project. *See id.* at 13. In addition, if the Puerto Rico Department of Housing—or any other governmental agency with oversight authority, such as FEMA—made any project-wide changes that affected Ironsides' work, SLS would occasionally communicate them to Avila. *See id.* at 17. But other times, Avila learned of project-wide changes directly from the governmental agency implementing them. *See id.* at 18.

Avila had both Ironsides and SLS e-mail accounts. *See id.* at 11. SLS provided Avila with safety equipment and a Samsung tablet, which he used while performing his work for Ironsides. *See id.* at 14–15. Avila's badge identified him as a quality manager for Ironsides, but the "ID pouch" on his neck lanyard had an SLS logo on the backside. *See id.* Avila claimed that SLS would sometimes make decisions regarding Ironsides' work that went beyond its quality. For example, when inspecting electrical work, Avila testified that SLS complained if the wires (e.g., red, black, yellow) were threaded in a particular order, even if there was no problem with the electrical component of the work. *See id.* at 19. But the majority of Avila's complaints regarding SLS's purported control over Ironsides' work concerned project-

specific requirements. *See id.* at 20. Moreover, it appears Avila considered any commentary from SLS's inspectors to be a direction concerning how Ironsides was to perform its work unless SLS was inspecting a finished product. *See id.* at 32 ("Once again, its not completed, so it's not done. You know, you can't give me your take on quality until I say I'm done.").

Aside from this testimony, the only evidence regarding Opt-in Plaintiffs' respective employment situations is Plaintiffs' amalgamated discovery response, which combines all Opt-in Plaintiffs' responses to the Court-ordered discovery into one document. *See* Dkt. 88-3. Many of the Opt-in Plaintiffs who remain part of the collective classes did not produce documents responsive to the Court-ordered discovery but indicated they would supplement their responses if they were able to locate them. *See generally* Dkt. 107-3. Plaintiffs have not supplemented their global discovery response, so I assume those Opt-in Plaintiffs were unable to locate pay records, invoices, or other evidence of time worked; contractual agreements with their respective subcontractors (e.g., offer letters or employment or compensation agreements); documents that would support their claim that SLS willfully violated the FLSA; or documents demonstrating that they should have been classified an employee. *See* Dkt. 88-3.

According to Plaintiffs' discovery response, six of the remaining class members (including Browne, Hernandez, Hill, and Ray) worked on the USVI Project, while the other 38 (including Avila) worked on the Puerto Rico Project. *See generally id.* Most class members allege they were paid on an hourly rate, while the minority claim they were paid a flat daily or weekly rate. There are also a few outliers, such as Brett Crooks, who claims he was paid a day rate or received "$0.15/per sq. foot per roof." *Id.* at 35. And five remaining class members have the placeholder "Will Supplement" next to their name. *See id.* at 35–39. As for the class members' job titles, they cover the spectrum:

- Quality Manager
- Group Leader
- Assistant Manager
- "Lead Man"
- Labor Crew Leader
- Foreman

- Project Supervisor
- Troop Leader
- Roofer
- "Helper"

- Administration
- Crew Member
- Handyman
- Inspector

- Laborer
- Carpenter
- General Contractor
- Quality Inspector

*See* Dkt. 88-3 at 25–28. Although nearly two-fifths identify as either "Laborer" or "Handyman," their responsibilities range from general carpentry and roofing to plumbing and electrical work. Finally, each Opt-in Plaintiff supplies the following boilerplate response regarding the alleged FLSA violation:

> SLS misclassified Opt-in as an independent contractor. Opt-in was not paid proper overtime even though he was performing non-exempt and manual labor relief work. Opt-in reported to SLS and had to follow SLS policies and procedures. Opt-in also performed work on SLS jobsites in which SLS was in charge of the site and the finished product. All job assignments came from SLS.

*Id.* at 28–34.

Put bluntly, Plaintiffs must demonstrate a common plan to violate the law, not just to build houses. Although there is certainly a common theme among the class members' allegations—that SLS and its subcontractors misclassified them as independent contractors and failed to pay them—Plaintiffs have presented no evidence that SLS had any say in how its subcontractors classified their workers or their pay practices. Not to mention, the lack of consistency among the methods and rates class members were paid by their respective subcontractors severely undercuts Plaintiffs' allegation that SLS had any influence over its subcontractors' pay practices. To the extent SLS oversaw its subcontractors' work product, such supervision is insufficient to establish a common plan, policy, or decision among SLS and its subcontractors to violate the FLSA. Rather, as explained in greater detail in the following section, SLS's supervision was limited to ensuring work was performed in accordance with each project's specifications.

While I agree that the general scope of the Opt-in Plaintiffs' work concerned either the construction or renovation of damaged homes, I cannot agree with

Plaintiffs' claim that "[a]ll relief workers performed similar duties involving manual labor." Dkt. 93 at 20. The Opt-in Plaintiffs performed a vast array of different tasks at different locations for different subcontractors that required different skills. Although some of them may be similarly situated in certain respects, the facts demonstrate considerable class-wide differences.

Most concerning are the dissimilarities between the Named Plaintiffs' and Opt-in Plaintiffs' employment settings, which strongly undermines the contention that they are similarly situated. *See Lipnicki*, 2014 WL 5620603, at *3 ("Absent similarity in actual job performance, a uniform classification alone may be insufficient to meet the certification standard."). Aside from Avila, the evidence indicates that, at best, the class members had a peripheral working relationship with SLS. In fact, given Avila's supervisory position as a quality manager, relative to the other class members, he is a particularly poor class representative. Finally, although Browne's declaration testimony does claim that SLS controlled where/when he worked and his rate/method of pay, Browne's testimony is couched with the caveat that SLS's carried out its alleged conduct either "through" or in conjunction with ProSolar or other subcontractors. *See* Dkt. 34-2 at 2 ("SLS and ProSolar dictated the amount of the hourly rate I received."); *id.* at 3 ("ProSolar, through SLS, assigned me . . . to work for their clients at various locations."); *id.* ("SLS and its subcontractors (like ProSolar) and their clients dictated and scheduled the days that I worked."). Given the far more detailed testimony of Hernandez, Hill, and Ray—all of whom, like Browne, worked on the USVI Project—Browne's conclusory testimony does little to move the needle in Plaintiffs' favor.

In sum, Plaintiffs have alleged a widespread plan or policy to deny them overtime compensation coupled with generalized—and speculative—allegations about SLS's control over its subcontractors' pay practices. This is not sufficient to establish class-wide similarity. *See Moss*, 201 F.R.D. 398 at 409–10 ("Generally, allegations of an overarching policy are insufficient, and plaintiffs are required to

produce substantial evidence of a single decision, policy or plan." (cleaned up)). Accordingly, I find that this factor strongly favors decertification.

### 2. *Defenses Available to SLS Which Are Individual to Each Plaintiff (the second decertification factor)*

#### i. Evidence that Some Plaintiffs Were Paid Overtime

SLS argues that around 24 of the remaining 44 class members were paid overtime or otherwise not properly part of either collective class based on their pay records. *See* Dkt. 108-1. I have looked at the pay records and agree that some demonstrate that the Opt-in Plaintiffs received overtime pay. Others do nothing of the sort or are indiscernible. While others suspiciously claim that all workers for that respective subcontractor worked 40 hours every week—never more, and never less. Most troubling, it appears the records for at least some of the Opt-in Plaintiffs cover only a portion of the time they claim to have worked on the projects.[11]

All said, this factor weighs slightly in favor of decertification, as I would have to perform an individual analysis to determine whether these Opt-in Plaintiffs are properly part of either collective class.

#### ii. Whether the Court Can Conduct a Joint-Employer Analysis on a Class-Wide Basis

Finally, we get to the heart of SLS's decertification argument. Plaintiffs allege SLS acted as a joint employer with the subcontractors. *See* Dkt. 24 at 2. Thus, Plaintiffs' entire theory of the case depends upon my finding a joint-employer relationship between SLS and its subcontractors.

---

[11] For example, Felix Alicea-Martinez claims to have worked on the Puerto Rico Project from June 5 to October 1 of 2018. *See* Dkt. 88-3 at 23. However, her pay records cover only a two-week period in August 2018. *See* Dkt. 108-1 at 12–13. Although they include an overtime rate and indicate she had withholdings taken from her paycheck, it appears she worked 48 hours one week without receiving any overtime. *See id.* at 13. All this is to say, I am not going to go through and cross-reference Plaintiffs' discovery responses with the pay records SLS produced to see if they cover the full period each Opt-in Plaintiff claims to have worked—especially when SLS has included pay records that appear to demonstrate the opposite of what it hoped to show. *See, e.g.*, *id.*

a.   <u>Joint Employment under the FLSA</u>

Under the FLSA, an employer must pay overtime compensation to its non-exempt employees who work more than 40 hours a week. *See* 29 U.S.C. § 207(a)(1). Independent contractors, however, are not entitled to overtime under the FLSA. *See* 29 U.S.C. § 207(a)(1). Liability for violating the FLSA's overtime provision attaches to individuals and entities who qualify as an "employer." *See Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971 (5th Cir. 1984).

Consistent with its broad, remedial purposes, the FLSA defines the term "employer" expansively—the statute places no express limitation on the word's meaning, stating only that it "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA defines the related terms "employee" and "employ" in similarly broad fashion. *See id.* § 203(e)(1) (defining "employee" as "any individual employed by an employer"); *id.* § 203(g) (stating that the term "employ" "includes to suffer or permit to work"). The breadth of these definitions brings some employment relationships that might not qualify as such "under a strict application of traditional agency law principles" or under other federal or state statutes within the FLSA's coverage. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

The FLSA does not expressly reference "joint employment." Rather, the joint-employment doctrine has largely evolved through various interpretations of law by the Department of Labor ("DOL") and federal courts. *See Folk v. Brennan*, 414 U.S. 190, 165 (1973) (recognizing that maintenance workers were employees of both the building owners and the company rendering management services for the owners); *Hodgson v. Griffin and Brand of McAllen, Inc.*, 471 F.2d 235, 237–38 (5th Cir. 1973) (discussing joint-employer status); *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669 (5th Cir. 1968) (recognizing the concept of joint employers).

The DOL's regulations implementing the statute recognized that "[a] single individual may stand in the relation of an employee to two or more employers at

the same time. 29 C.F.R. § 791.2(a), *removed and reserved*, effective Oct. 5, 2021. "If all the relevant facts establish that [those] employers are acting entirely independently of each other and are completely disassociated with respect to the employment of [the] employee," then they are treated as "separate and distinct" employers. *Id*. On the other hand, if the facts show that "employment by one employer is not completely disassociated from employment by the other employer(s)," then they are treated as "joint employers." *Id. Accord Donovan v. Sabine Irrigation Co*., 695 F.2d 190, 194 (5th Cir. 1983) (recognizing that the term "employer" "has been interpreted to encompass one or more joint employers").

      b.  <u>The Framework for Determining Joint-Employment Status in this Circuit</u>

      In determining a party's status as an employer under the FLSA, courts rely on the economic-realities test. *See Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014). Labels, such as "independent contractor" are "dispositive only to the degree that [the label] mirrors the economic reality of the relationship." *Donovan v. Tehco, Inc*., 642 F.2d 141, 143 (5th Cir. 1981). Determining whether a defendant is an employer entails a fact-intensive inquiry based "upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). This "diagnosis is not always easy to perform" because there are no neat diagnostic formulas, "only rough guidelines and checklists to determine employee status." *Brock v. Mr. W Fireworks, Inc*., 814 F.2d 1042, 1043 (5th Cir. 1987).

      For determining joint-employer status, the Fifth Circuit set forth the following framework in *Wirtz v. Lone Star Steel Co*.:

> In considering whether a person or corporation is an "employer" or "joint employer", the total employment situation should be considered with particular regard to the following questions: (1) Whether or not the employment takes place on the premises of the company?; (2) How much control does the company exert over the employees?; (3) Does the company have the power to fire, hire, or modify the employment condition of the employees?; (4) Do the employees perform a 'specialty job' within the production line?; and (5) May the employee refuse to work for the company or work for others?

405 F.2d at 669–70. Under *Lone Star Steel*, these five considerations are all potentially relevant, but not necessarily exhaustive, since "[e]ach case must be considered in light of the total situation or whole activity to determine whether an employer-employee relationship exists." *Id.* at 669.

Over time, the Fifth Circuit has held that courts deciding whether a joint-employer relationship exists must apply the economic-realities test. *See Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012). The four-factor economic-realities test asks whether an alleged employer: (1) possessed the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *See id.* "In joint employer contexts, each employer must meet the economic reality test." *Orozco*, 757 F.3d at 448.

I recognize that *Gray* and its progeny are not without criticism.[12] Nevertheless, SLS argues that courts can consider any of the *Lone Star Steel* or *Gray* factors when conducting its joint-employer inquiry. I agree.[13] *See, e.g.*, *Itzep*

---

[12] There is an inherent tension between the Fifth Circuit's holdings in *Lone Star Steel* and *Gray*. "Although there is some overlap between the *Lone Star Steel* framework and *Gray*'s [four-factor] test," *Gray* expressly held that there can be no finding of employer status when not one of the four factors is present. *Seong Song v. JFE Franchising, Inc.*, 394 F. Supp. 3d 748, 756 (S.D. Tex. 2019). *See Gray*, 673 F.3d at 357. Given that "the four factors recited in *Gray* ignore several considerations expressly identified in *Lone Star Steel* as being particularly relevant to assessing joint employer status. . . . *Gray* unavoidably contradicts *Lone Star Steel*'s mandate that joint employer determinations be based upon the totality of each situation." *Seong Song*, 394 F. Supp. 3d at 756. *See also Prejean v. Satellite, Inc.*, No. CV 17-1170, 2019 WL 6320377, at *4 n.2 (W.D. La. Nov. 25, 2019) (acknowledging the conflict between *Lone Star Steel* and *Gray*). Even recognizing this difference, the tests are substantially similar—the second and third *Lone Star Steel* considerations largely overlap with *Gray*'s first and second factors, so the same evidence concerning the putative employer's authority over the alleged employee will create a triable issue of fact under either test.

[13] It is black-letter law that one panel cannot overturn a prior panel. *See Mactal v. U.S. Dep't of Lab.*, 171 F.3d 323, 328 (5th Cir. 1999). Thus, *Lone Star Steel*, as the earlier circuit precedent, controls—but only to the extent there is a conflict. That is, the district court's criticism in *Seong Song* is not about *Gray*'s four-factor test, but rather that the test is incompatible with *Lone Star Steel* because *Gray* requires at least one of the factors to be present to bestow employer status, while *Lone Star Steel* held that no one factor is determinative. *See Lone Star Steel*, 405 F.2d at 669. In other words, the criterion identified in *Gray* may be sufficient to support a finding of joint-employer status but are not necessary.

*v. Target Corp.*, 543 F. Supp. 2d 646, 653 (W.D. Tex. 2008) (citing both *Gray*'s and *Lone Star Steel*'s factors and observing that "[n]o one factor is determinative of whether a defendant is an 'employer' under the FLSA"); *Artis v. Asberry*, No. 3:10-cv-323, 2012 WL 5031196, at *4 (S.D. Tex. Oct. 16, 2012) (same).[14]

We venture deeper into the thicket with Plaintiffs' Response to SLS's Motion to Decertify, which implores me to apply the oft-cited *Silk*[15] factors used to determine whether a worker is an employee or independent contractor. Dkt. 89 at 12–25. The Fifth Circuit has synthesized *Silk*'s holding down to five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and alleged employer; (3) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *See Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 327 (5th Cir. 1993).

The problem with relying on the *Silk* factors in this case is that those factors focus on whether Plaintiffs' classification as an independent contractor was correct, not whether SLS was a joint employer. *See Biziko v. Van Horne*, No. 1:16-CV-0111-BP, 2019 WL 3928575, at *9 n.8 (N.D. Tex. Aug. 20, 2019) (recognizing that the *Silk* factors differ from those used to determine joint-employer status but stating that both tests require courts make the determination "upon the circumstances of the whole activity," not isolated factors (quoting *Rutherford Food Corp.*, 331 U.S. at 730)).

From a big-picture level, all three tests look toward the degree of control the putative employer exercised or could exercise over the alleged employee; *Lone Star Steel* and *Gray* ask whether the putative employer had the authority to hire or fire

---

[14] Notably, the district courts in *Itzep* and *Artis* also cited *Gray*'s four-factor test, but neither court based its decision on that test alone. *See Itzep*, 543 F. Supp. 2d at 653; *Artis*, 2012 WL 5031196, at *4, *6–7.

[15] *United States v. Silk*, 331 U.S. 704, 716 (1947).

the alleged employee or exerted control over the alleged employee's conditions of employment; and *Lone Star Steel* and *Silk* ask whether the job in question requires a specialized skill and whether the alleged employee had the ability to work for other employers (i.e., permanency). Given that the Fifth Circuit has frequently acknowledged that district courts must consider the totality of the circumstances when considering a worker's employee status under the FLSA, all the above-mentioned tests may inform my decision. *See Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961). But to the extent there is any conflict, the framework set out in *Lone Star Steel* remains controlling.

c.   Can the Factors Be Applied on a Class-Wide Basis?

The short answer is no.

Plaintiffs' joint-employer theory hinges on the notion that SLS exercised the same level of control over all its subcontractors—and, therefore, its subcontractors' employees—because all subcontractors were contractually required to adhere to the same specifications or follow the same plan and procedures. Thus, according to Plaintiffs, SLS treated all class members the same, regardless of the subcontractor for which they worked or the work they performed. Accordingly, Plaintiffs argue, because the subcontractors' pay practices violated the FLSA, SLS is liable for their subcontractors' FLSA violations under the joint-employer doctrine. However, these conclusory allegations and inferences are the exact type that the Fifth Circuit has found insufficient to establish a joint-employer relationship. *See Gray*, 673 F.3d at 355.

Requiring subcontractors to adhere to general construction specifications is insufficient to create a joint-employer relationship. Similarly, inspecting a subcontractor's work to confirm it satisfied the project-wide standards—standards imposed by the STEP Program, not SLS—is not evidence of a joint-employer relationship. *See Artis*, 2012 WL 5031196, at *5 ("supervision and control should not be misinterpreted to encompass run-of-the-mill subcontracting relationships" (quotation omitted)); *Ling Nan Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 75 (2d

Cir. 2003) ("[S]upervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement."). Likewise, ensuring compliance with various jobsite safety regulations, even if the requirement to do so ostensibly "flowed-down" to the subcontractors under the subcontractor agreements, does not demonstrate that SLS exercised sufficient control over its subcontractors' work to infer a joint-employer relationship. *See, e.g.*, *Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2004) ("Any airline that is concerned about its passengers' safety would be remiss to simply delegate a task to another party and not double-check to verify that the task was done properly. We therefore believe that the purported control or supervision alleged [is insufficient to establish a joint-employer relationship].").

Plaintiffs repeatedly cite SLS's corporate representatives' testimony as further proof that SLS controlled and supervised its subcontractors' employees. But Plaintiffs are confusing precautions that SLS took to ensure job safety and performance quality with evidence of control. Although there is *some* evidence that SLS may have exercised *nominal* control that *could* be indicative of a joint-employer relationship, it is sparse and inconsistent. Moreover, Plaintiffs' own testimony demonstrates that the purported level of control exercised by SLS varied from subcontractor to subcontractor—at least with regard to the subcontractors for which Plaintiffs have presented any appreciable evidence, such as Ironsides and DEL. For the other subcontractors, I am left in the dark. Certainly, such sporadic evidence is insufficient to infer a mass joint-employer relationship with respect to each of SLS's subcontractors. *See generally Mendez v. Timberwood Carpentry & Restoration, LLC*, No. CIV.A. H-09-490, 2009 WL 4825220, at *6 (S.D. Tex. Dec. 9, 2009) ("the two entities were engaged in a standard independent subcontracting arrangement—a relationship that the law resists deeming as a dual employment situation").

Finally, Plaintiffs point to the Samsung tablets as evidence that SLS controlled their scheduling and work. The use of tablets to deploy or track project assignments, costs, and, in general, overall production is not the type of "control" that should give rise to a joint-employer relationship—especially considering the circumstances SLS faced. Hundreds, if not thousands, of contractors, subcontractors, sub-subcontractors, sub-sub-subcontractors, etc. were tasked with repairing tens of thousands of damaged structures across Puerto Rico and the USVI. SLS, alone, contracted to restore over 29,000 homes. Holding SLS accountable as a joint employer for embracing technological innovation to overcome what must have been a logistical nightmare—e.g., availability of materials, damaged terrain and infrastructure, power outages, communication disruptions—finds no support in the caselaw.

All said, the limited representative evidence Plaintiffs have provided regarding SLS's relationship with or control over a few subcontractors is wholly insufficient to infer that SLS acted as a joint employer with regard to each and every one of its subcontractors. In other words, adjudicating this case on a class-wide basis would require that the Court apply the economic-realities test to each subcontractor's relationship with SLS. *See Arnold v. Directv, LLC*, No. 4:10-CV-352-JAR, 2017 WL 1251033, at *3 (E.D. Mo. Mar. 31, 2017) ("Because the joint employer analysis is 'inherently fact intensive,' the varying employment circumstances of the collective class members create individual defenses which make this issue unsuitable for collective treatment.").

Frankly, I do not see how I can conduct a proper joint-employer analysis for the putative classes whose members worked for 21 (or more) different subcontractors without encountering significant manageability problems. *See Proctor*, 250 F.R.D. at 281 (decertification is proper where the court cannot coherently manage the class). As with the first factor, the second factor strongly favors decertification.

**3.** ***Fairness and Procedural Considerations (the third decertification factor)***

The purpose of collective actions is to try several claims rather than multiple individual trials. Courts must ensure that proceeding as a collective action will not require a highly individualized inquiry into each Opt-in Plaintiffs' circumstances, as that would detract from the FLSA's overarching goal to efficiently resolve in one proceeding issues of law and fact that are common to the members of a collective action. *See Kibodeaux*, --- F.3d ---, 2022 WL 92856, at *4. Where there are significant differences in employment experiences, the procedural advantages of a collective action evaporate. *See Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 588 (E.D. La. 2008). As discussed above, individualized proof would be necessary to determine the merit of each class member's claim.

For the foregoing reasons, I recommend the Court **GRANT** SLS's Motion to Decertify, **DECERTIFY** the two collective classes, and **DISMISS** the Opt-in Plaintiffs' claims without prejudice to refiling.

## III.  MOTION FOR SUMMARY JUDGMENT

SLS has moved for summary judgment as to all claims brought against it on the ground that it was not a joint employer as a matter of law under the FLSA or related wage-and-hour statutes. *See* Dkt. 89. Because I have recommended that the collective action be decertified, the only remaining claims are those brought by the Named Plaintiffs.

### A.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *See Rodriguez v. Webb Hosp. Corp.*, 234 F. Supp. 3d 834, 837 (S.D. Tex. 2017). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once satisfied, the burden

shifts to the nonmovant to show the existence of a genuine fact issue for trial. *See id.* at 324.

To survive summary judgment, the nonmovant must "present competent summary judgment evidence to support the essential elements of its claim." *Cephus v. Tex. Health & Hum. Servs. Comm'n*, 146 F. Supp. 3d 818, 826 (S.D. Tex. 2015). The nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quotation omitted). Rather, the "nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim." *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 584 (S.D. Tex. 2015). In ruling on a motion for summary judgment, I must construe "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020).

Joint-employer status is generally a question of fact. *See Pearson v. Frequency Car Audio #1, L.L.C.*, 741 F. App'x 275, 276 (5th Cir. 2018). But where there are no material facts in dispute, joint-employer status is it a question of law. *See Itzep*, 543 F. Supp. 2d at 653. Factual disputes "that are irrelevant or unnecessary" to my determination will not suffice to create a material fact issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Virgin Islands Fair Wages and Hours Act and Puerto Rico's Working Hours and Days Act largely mirror the FLSA's compensation regulations. Courts may resort to the FLSA and its regulations for aid in their proper construction. *See Del Valle v. Officemax N. Am.*, 680 F. App'x 51, 63 (3d Cir. 2017) (Virgin Islands Fair Wages and Hours Act); *Colon v. Colomer & Suarez San Juan, Inc.*, No. 18-1360 (MDM), 2020 WL 4548120, at *19. (D.P.R. Aug. 6, 2020) (Puerto Rico's Working Hours and Days Act).

**B.** **ANALYSIS**

The legal framework for my analysis is set forth in my discussion of SLS's Motion to Decertify, namely, my discussion of the joint-employment doctrine. For liability to attach, Named Plaintiffs must show that SLS was their joint employer. No single factor is determinative of whether a defendant is an "employer" under the FLSA. *See Iztep*, 543 F. Supp. 2d at 653. As already discussed, various iterations of the economic-realities test provide several non-exhaustive factors for courts to consider. Each test looks at the totality of the circumstances. But central to my analysis is the amount and extent of control SLS can or did exercise over the purported employee(s).

### 1. *Named Plaintiffs' Work Did Not Take Place on SLS's Premises*

*Lone Star Steel* asks: "Whether or not the employment takes place on the premises of the company?" 405 F.2d at 669. Here, the work in dispute took place on jobsites owned by the homeowners, not SLS. Although SLS had a certain amount of reputational liability as it was ultimately responsible for the finished product, *see* Dkt. 93-2 at 12, the jobsites cannot fairly be said to be SLS's "premises." *See* Dkt. 34-2 at 3 ("[W]e only worked on locations run by SLS's clients.").

### 2. *SLS Exerted Nominal Control Over Named Plaintiffs*

#### i. **Power to Hire or Fire**

Neither Avila nor Browne were hired by SLS. However, Avila testified that he believed there were a "couple times" where SLS reported to Ironsides' office manager that SLS did not want a particular work crew "to work on their jobs anymore." Dkt. 93-5 at 12.

#### ii. **Ability to Accept Other Work**

Avila testified that it "was [his] understanding" that he could not leave Ironsides and work for another subcontractor based on a conversation he had with an SLS inspector during one of their final inspections. *See id.* at 8–9. Similarly, Browne vaguely testified that he was "prohibited . . . from negotiating additional

work." Dkt. 34-2 at 3. Avila also mentioned some type of non-compete agreement. *See* Dkt. 93-5 at 8. SLS correctly points out that there is no evidence of a non-compete agreement anywhere in the record, nor is there evidence that SLS ever prohibited workers from accepting additional work.

### iii.   Supervision and Control of Work Schedules and Other Conditions of Employment

"[E]xtensive supervision weighs in favor of joint employment only if it demonstrates effective control of the terms and conditions of the plaintiff's employment." *Zheng*, 355 F.3d at 75.

**Browne.** When viewed in the light most favorable to Browne, the evidence demonstrates that SLS had, at best, tangential control over his work schedule to the extent that SLS sent ProSolar work orders. However, evidence concerning SLS's purported supervision or control over Browne's conditions of employment is incredibly thin. In fact, Browne's evidence is based exclusively on his unfounded—or, at least, insufficiently explained—subjective belief that "SLS, its subcontractors, and/or its clients controlled [his] work." Dkt. 34-2 at 4. For example, although Browne complains he was "required . . . to adhere to strict guidelines, expectations and[,] directives" and did not have any "discretion to create or stray away from established policies, practices, or regulations," *id.* at 4, he admitted that his "job included applying FEMA's set standards . . . on an individual project basis." *Id.* at 3. Moreover, Browne also admitted that he "only worked on locations run by SLS's clients," "receive[d] work orders from ProSolar," and "reporte[d] . . . directly to [his] supervisor with ProSolar." *Id.* at 2–3. Even Browne's complaint about unspecified "on-the-job training" does little to move the needle in his favor, considering he simultaneously testified that "[his] job duties were akin to that of a construction worker or handyman" and did not require any "specialized education." *Id.*

It does not escape my notice that Browne's depiction of SLS's purported control over its subcontractors' work on the USVI Project, at times, paints a bleaker

picture than that provided by Hernandez, Hill, and Ray. *See supra* at 15–16. I understand that I cannot simply ignore conflicting testimony at summary judgment, as it is not my role to evaluate its credibility. Even so, when accepting Browne's version of events, on the whole, his testimony does nothing more than demonstrate supervision and control indicative of "a standard independent subcontracting agreement—a relationship that the law resists deeming as a dual employment situation." *Mendez*, 2009 WL 4825220, at *6. *See Artis*, 2012 WL 5031196, at *5 ("supervision and control should not be misinterpreted to encompass run-of-the-mill subcontracting relationships" (quotation omitted)).

**Avila.** SLS determined where and when Avila performed his inspections. *See* Dkt. 93-5 at 14, 16. This meant SLS would regularly require Avila to travel from one jobsite to another, sometimes with little to no notice. However, it is important to keep in mind that Avila's primary employment responsibility as a quality manager was to inspect Ironsides' work with an SLS representative to ensure it complied with the overall project standards. Ironsides' crews worked on jobsites across the island, so it is difficult for me to envision a scenario where SLS could have feasibly coordinated its inspection schedule with Avila and other quality managers without determining their inspection schedules.

Nonetheless, the general thrust of Avila's testimony was that he was "answering directly to SLS more than [he was] to Ironsides," and that SLS required Ironsides to perform or redo work that he believed went outside the specter of ensuring the finished product complied with Ironsides' contractual requirements. *See id.* at 19–20. This extends beyond where and when Avila performed his inspection responsibilities. Instead, Avila complains that SLS's oversight spilled over to dictating the method of his (or Ironsides') work. Although Avila's testimony is anecdotal at times, the level of purported supervision and control SLS allegedly exercised likely goes beyond supervision with respect to contractual warranties of quality. Overall, this testimony weighs in Avila's favor.

SLS forcefully argues that setting a time for quality inspections between representatives of SLS and Ironsides is not the type of control or supervision over work schedules and employment conditions contemplated by the caselaw. SLS's argument is not without merit. Still, while I am mindful of the mercurial nature of Avila's testimony, when considering it on the whole, and keeping in mind that it is not my role to weigh the evidence or evaluate its credibility at the summary-judgment stage, I find that evidence of SLS's purported control tip the scales in Avila's favor.

### 3. *SLS Did Not Determine Named Plaintiffs' Rate or Method of Payment*

For this factor, Named Plaintiffs' principally direct me to provisions in the Puerto Rico Contract and USVI Contract regarding overtime requirements and compliance with prevailing wage rates. But Named Plaintiffs agree this is not a breach-of-contract case. Moreover, to the extent the Contracts incorporated the Davis-Bacon Act, which regulates certain aspects of federal construction contracts, it does not provide a private right of action. *See Amaya v. Power Design, Inc.*, 833 F.3d 440, 443–44 (4th Cir. 2016). Rather, its enforcement mechanism is internal to the DOL. *See id.* at 443. Named Plaintiffs also point to SLS's compliance with the Puerto Rico Department of Housing's wage-compliance monitoring program as proof of a genuine issue of material fact regarding their joint employment. Even if I were to place any weight in the fact that SLS acted as a middleman between the Puerto Rico Department of Housing and its subcontractors to facilitate the transfer of pay records, it still does not indicate that SLS had any authority to determine its subcontractors' rate or method of payment.

### 4. *SLS Did Not Maintain Named Plaintiffs' Employment Records*

Again, Named Plaintiffs direct me toward SLS's acquiescence with the Puerto Rico Department of Housing's wage-compliance monitoring program as proof that it maintained *some* employment records. *See* Dkt. 95 at 25. But SLS did not "maintain" these records in the true sense of the word. Yes, some employment

records were technically available on an SLS e-mail account. But it is important to keep in mind that the Puerto Rico Department of Housing requested these documents as part of a random audit process. SLS would inform subcontractors selected for the audit to provide the requested records. Those subcontractors then sent their records to SLS, which SLS forwarded to the Puerto Rico Department of Housing without ever viewing them. *See* Dkt. 93-2 at 6–7.

***

On balance, when considering the totality of the circumstances, I find no issue of material fact exists as to whether SLS was Browne's joint employer and, therefore, recommend the Court **GRANT** summary judgment in SLS's favor. However, when viewing the evidence in the light most favorable to Avila and drawing all reasonable inferences in his favor, I find that a genuine issue of material fact does exist as to whether SLS was his joint employer. Accordingly, I recommend the Court **DENY** summary judgment on Avila's claims. Because material facts are in dispute, SLS's joint-employer status must be determined by the trier of fact. *See Pearson*, 741 F. App'x at 276.

## CONCLUSION

For the foregoing reasons, I recommend that the Court **GRANT** SLSCO, Ltd.'s Motion for Conditional Class Decertification (Dkt. 88), **DECERTIFY** the two collective classes, and **DISMISS** the Opt-in Plaintiffs' claims without prejudice to refiling.

I further recommend the Court **GRANT in part** and **DENY in part** SLSCO, Ltd.'s Motion for Summary Judgment. *See* Dkt. 89. Specifically, I recommend that Browne's claims against SLSCO, Ltd. be dismissed with prejudice to refiling, while Avila's claims survive summary judgment.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from the receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an

aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED this 15th day of March 2022.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE